CASE NO. 24-13385-AA

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

---

SOUTHEAST DEVELOPMENT PARTNERS, LLC and
SOUTHEAST LAND VENTURES, LLC,

Plaintiffs-Appellants,

v.

ST. JOHNS COUNTY, FLORIDA,

Defendant-Appellee.

---

On Appeal from the United States District Court
for the Middle District of Florida
Case No. 3:23-cv-00846-CRK-PDB

---

**APPELLANTS' INITIAL BRIEF**

---

**Glenn Burhans, Jr.**
**Erin J. Tilton**
**Liz Desloge Ellis**
**STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.**
106 E. College Avenue, Suite 700
Tallahassee, Florida 32301
Telephone: 850-580-7200

*Attorneys for Appellants*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Under Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, the following is an alphabetical list of trial judges, attorneys, persons, firms, partnerships, and corporations known to have an actual or potential interest in the outcome of this appeal:

1. Barksdale, Patricia D., U.S. Magistrate Judge

2. Boileau, Alain E.

3. Burhans, Jr., Glenn T.

4. Cremer, Jacob T.

5. Day Late Enterprises, Inc.

6. Ellis, Liz Desloge

7. Harris, Marc

8. Howard, Marcia Morales, U.S. District Judge

9. Hyatt, Keith

10. Kelly, Claire R., U.S. Court of International Trade Judge

11. Murphy, Hannah E.

12. Nabors Giblin & Nickerson, P.A.

13. Neugebauer-MacInnes, Nicole A.

14. Perpetuus Realty Partners, LLC

15. Schrader, Carly J.

16.     Shaud, Matthew

17.     Smith, Dennis

18.     Smith, Julie

19.     Southeast Development Partners, LLC

20.     Southeast Land Ventures, LLC

21.     Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A.

22.     Stewart, Gregory Thomas

23.     Tilton, Erin J.

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.101 through 26.1-3, Appellants, SOUTHEAST DEVELOPMENT PARTNERS, LLC and SOUTHEAST LAND VENTURES, LLC, make the following statement as to corporate ownership:

SOUTHEAST DEVELOPMENT PARTNERS, LLC is not publicly traded and, therefore, no publicly held corporation owns 10% or more of its stock.

SOUTHEAST LAND VENTURES, LLC is not publicly traded and, therefore, no publicly held corporation owns 10% or more of its stock.

ST. JOHNS COUNTY is a political subdivision of the State of Florida.

## STATEMENT REGARDING ORAL ARGUMENT

Appellants respectfully submit that oral argument would aid the Court in resolving this appeal, which presents multiple novel and complex issues of both federal and Florida law.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ....................................................C-1

CORPORATE DISCLOSURE STATEMENT ....................................................C-3

STATEMENT REGARDING ORAL ARGUMENT ............................................. i

TABLE OF AUTHORITIES ...................................................................... iii

STATEMENT OF JURISDICTION..................................................................1

    I.    Basis for District Court Subject Matter Jurisdiction ............................1

    II.    Basis for Appellate Jurisdiction and Timeliness of Appeal..................1

APPENDIX ........................................................................................2

STATEMENT OF THE ISSUES....................................................................2

STATEMENT OF THE CASE .......................................................................2

    I.    Transportation Concurrency....................................................2

    II.    The Grand Oaks Planned Unit Development........................................5

    III.    The Concurrency and Impact Fee Credit Agreement. .........................7

        A.    The Land Development Traffic Analysis and Engineer's Opinion of Probable Cost.............................................9

        B.    Payments and Triggers under the Agreement..........................11

        C.    CIFA Amendment....................................................17

    IV.    Course of Proceedings and Disposition Below.................................20

STANDARD OF REVIEW ........................................................................23

SUMMARY OF THE ARGUMENT ...................................................................23

ARGUMENT .....................................................................................25

I.     The District Court erred in granting summary judgment in favor of the County on Count I and II of the Amended Complaint and Count I of the Second Amended Counterclaim. .................................25

       A.    The Agreement does not require Southeast Development or Southeast Land to pay all costs for the SR 16 Improvements.............................................................................27

       B.    Southeast Development did not breach the Agreement............32

       C.    The County breached the Agreement. ......................................38

II.    The District Court erred in granting summary judgment in favor of the County on Count IV of the Amended Complaint. ....................42

       A.    Both Southeast Development and Southeast Land have Standing to Bring Count IV. .......................................................42

       B.    The County's monetary exactions do not bear an essential nexus to a legitimate state interest and are not roughly proportional to the Grand Oaks Project impacts. ........43

CONCLUSION ......................................................................................47

CERTIFICATE OF COMPLIANCE ......................................................49

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Action Nissan, Inc. v. Hyundai Motor America*,
No. 22-13153, 2024 WL 3888756
(11th Cir. Aug. 21, 2024)....................................................................27

*Armstrong v. United States*,
364 U.S. 40 (1960)............................................................................44

*Bearden v. E.I. du Pont de Nemours and Co.*,
945 F.3d 1333 (11th Cir. 2019) ........................................................27

*De La Rosa v. Tropical Sandwiches, Inc.*,
298 So. 2d 471 (Fla. 3d DCA 1974)..................................................26

*Dependable Ins. Co. v. Landers*,
421 So. 2d 175 (Fla. 5th DCA 1982).................................................26

*Dolan v. City of Tigard*,
512 U.S. 374 (1994)................................................................43, 44, 45

*Hearn v. McKay*,
603 F.3d 897 (11th Cir. 2010) ..........................................................23

*Jenkins v. City Ice & Fuel Co.*,
160 So. 215 (Fla. 1935) .....................................................................26

*Koch Business Holdings, LLC v. Amoco Pipeline
Holding Co.*,
554 F.3d 1334 (11th Cir. 2009) ........................................................28

*Koontz v. St. Johns River Water Mgmt. Dist.*,
570 U.S. 595 (2013)................................................................44, 45, 46

*Lingle v. Chevron*,
544 U.S. 528 (2005)...........................................................................44

*Nollan v. California Coastal Comm'n*,
483 U.S. 825 (1987)................................................................43, 44, 45

*Regan v. Taxation with Representation of Wash.*,
    461 U.S. 540 (1983).........................................................................44

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
    547 U.S. 47 (2006)...........................................................................42

*Sans Souci v. Div. of Fla. Land Sales & Condos*,
    448 So. 2d 1116 (Fla. 1st DCA 1984) ...........................................26

*Sullivan Prop., Inc. v. City of Winter Springs*,
    899 F. Supp. 587 (M.D. Fla. 1995)................................................42

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*,
    429 U.S. 252 (1977).........................................................................42

**Constitution & Statutes**

28 U.S.C. § 1291 .........................................................................................2

28 U.S.C. § 1331 ...................................................................................1, 21

28 U.S.C. § 1367 ...................................................................................1, 21

42 U.S.C. § 1983 ............................................................................1, 21, 43

Fla. Const. Art. X, § 6 ..............................................................................43

Fla. Stat. § 163.3177 ..........................................................................39, 40

Fla. Stat. § 163.3180 .......................................... 2, 3, 4, 24, 28, 29, 30, 36

Fla. Stat. §§ 163.3220-163.3243 ..........................................................36

Fla. Stat. § 252.363 ...............................................................32, 33, 36, 38

St. Johns County Ordinance No. 2018-40
    (PUB 2017-02) (2018) ...................................................................37

**Land Development Code**

LDC Part 5.05.00 ......................................................................................36

LDC § 11.07.00..........................................................................................36

LDC § 11.09.00............................................................................................4

LDC § 11.09.01...............................................................................4

LDC § 11.09.03...............................................................................4

LDC § 11.09.04........................................................................36, 47

LDC § 11.09.05.............................................................................36

LDC § 11.09.06.....................................................................4, 5, 46

**Rules**

11th Cir. R. 26.1-1 ..........................................................................1

11th Cir. R. 26.101-26.1-3 ...............................................................3

Fed. R. App. P. 26.1 ....................................................................1, 3

Fed. R. Civ. P. 19 ..........................................................................22

Fed. R. Civ. P. 21 ......................................................................5, 22

Fed. R. Civ. P. 56 ..........................................................................23

Fla. R. Civ. P. 1.170 ......................................................................21

## STATEMENT OF JURISDICTION

**I.      Basis for District Court Subject Matter Jurisdiction.**

The original Complaint for Declaratory, Injunctive, and Other Relief in this matter was filed by Southeast Development Partners, LLC ("Southeast Development") against St. Johns County, Florida (the "County") on March 14, 2023, in the Circuit Court of the Seventh Judicial Circuit in and for St. Johns County, Florida as *Southeast Development Partners, LLC v. St. Johns County*, Case No. 2023-CA-306. [D.E. #1-1]. An Amended Complaint for Declaratory, Injunctive, and Other Relief (the "Amended Complaint") was deemed filed on June 26, 2023, joining Southeast Land Ventures, LLC ("Southeast Land") as a plaintiff and adding a claim against the County under 42 U.S.C. § 1983. [D.E. #1-1]. The County timely removed the matter to the U.S. District Court for the Middle District of Florida (the "District Court"), as the Amended Complaint presented a federal question, thereby providing a sufficient basis for subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367. [D.E. #1].

**II.     Basis for Appellate Jurisdiction and Timeliness of Appeal.**

The District Court's Order [D.E. #69] granting the County's motion for summary judgment and denying Appellants' motion for partial summary judgment, as well the District Court's Judgment [D.E. #70] thereon, were entered on September 13, 2024. Appellants timely filed their Notice of Appeal [D.E. #74] on October 14, 2024, within thirty days after the District Court's Order and Judgment were entered.

1

This Court has jurisdiction under 28 U.S.C. § 1291, as the District Court's Order granting the County's motion for summary judgment and denying Appellants' motion for partial summary judgment disposed of all claims against the parties and is a "final decision" within the meaning of 28 U.S.C. § 1291.

## APPENDIX

Appellant's Initial Brief references only those documents and filings that were before the District Court or filed with this Court and are labeled as "D.E. #."

## STATEMENT OF THE ISSUES

The District Court erred in granting summary judgment in favor of the County and denying summary judgment in favor of Appellants on Counts I and II of the Amended Complaint, as well as Count I of the Second Amended Counterclaim. The District Court further erred in granting summary judgment in favor of the County on Count IV of the Amended Complaint.

## STATEMENT OF THE CASE

### I.    Transportation Concurrency.

Concurrency is a process by which local governments ensure that public facilities and services (e.g., schools, utilities, parks, libraries, etc.) will be adequate to meet the demands of new development within their jurisdictional boundaries. In Florida, concurrency requirements are codified in Section 163.3180.[1]

---

[1] All references and citations to statutes are to the Florida Statutes (2024), unless otherwise noted.

Transportation is not one of the listed public facilities for which local governments must implement concurrency. However, if a local government chooses to voluntarily implement a transportation concurrency system, section 163.3180(5) contains certain requirements that the local government must meet.

Where a local government chooses to implement transportation concurrency, it must allow developers to mitigate the impacts of development is by entering into an agreement "to pay for or construct its proportionate share of required improvements." § 163.3180(5)(h)1.c. In many instances, local transportation infrastructure is deficient independent of the proposed development, which is accounted for in the statute. Section 163.3180(5)(h)2 states as follows:

> An applicant <u>shall not</u>[2] be held responsible for the additional cost of reducing or eliminating deficiencies. When an applicant contributes or constructs its proportionate share pursuant to this paragraph, a local government may not require payment or construction of transportation facilities whose costs would be greater than a development's proportionate share of the improvements necessary to mitigate the development's impacts.

Section 163.3180(5)(h)2 also contains the proportionate-share formula which must be used, which requires the applicant to identify the roads that have a "transportation deficiency as defined in subparagraph 4." § 163.3180(5)(h)2.b. "If any road is determined to be transportation deficient without the project traffic under

---

[2] All emphasis is added unless otherwise noted.

review, the costs of correcting that deficiency <u>shall be removed</u> from the project's proportionate-share calculation." *Id.* This methodology ensures that developers are only paying to correct impacts caused by their projects, as opposed to pre-existing deficiencies or deficiencies caused by other concurrent development. "The improvement necessary to correct the transportation deficiency is the funding responsibility of the entity that has maintenance responsibility for the facility." *Id.* Generally, this entity is the local government.

The County implements transportation concurrency through its Proportionate Fair Share Program ("Program"), which is codified as part 11.09.00 of the County's Land Development Code ("LDC"). The purpose of the Program "is to establish a method whereby the impacts of Development on transportation facilities can be mitigated by the cooperative efforts of the public and private sectors." LDC § 11.09.01. Generally, the Program applies to residential developments in the County where existing capacity is not available to serve the project. LDC § 11.09.03. Pursuant to the Program, developers can satisfy transportation concurrency obligations by making a proportionate share contribution, which can take several forms, including private funds, contributions of land, construction and contribution of facilities, or a combination thereof. LDC § 11.09.06.A.

The Program mandates that "[a] development shall not be required to pay more than its proportionate fair share," and "[t]he fair market value of the

proportionate fair share mitigation for the impacted facilities shall not differ regardless of the method of mitigation." LDC § 11.09.06.B.  The Program includes methodologies for calculating the developer's proportionate share obligation and for determining the value of the transportation improvement provided by the developer. LDC §§ 11.09.06.C-D.  Proportionate share contributions – regardless of form – are then applied as a credit toward the road impact fees for the project. LDC § 11.09.06.E.

## II.    The Grand Oaks Planned Unit Development.

The Grand Oaks Planned Unit Development ("Grand Oaks" or the "Project") is a master-planned community located on 524+/- acres on the south side of State Road 16 in St. Johns County ("Property").  At all times relevant hereto, Southeast Development was the master developer of Grand Oaks pursuant to a contract with the landowner, Day Late Enterprises, Inc. ("Day Late").[3]

On September 19, 2016, Southeast Development submitted concurrent applications for a large-scale comprehensive plan amendment to change the Future Land Use Map designation of the Property from Rural/Silviculture to Residential C (the "Comprehensive Plan Amendment") and for a rezoning from Open Rural ("OR") to Planned Unit Development ("PUD") (the "Rezoning"). [D.E. #48-3, p.

---

[3] While the County joined Day Late as a Counter-Defendant in the proceedings below, the District Court ordered that Day Late be dropped pursuant to Federal Rule of Civil Procedure 21 [D.E. #68]. Day Late is not a party to this appeal.

22:12-23:4; p. 190; p. 23:5-22]. On June 7, 2018, the County's Planning and Zoning Agency held a public hearing and recommended adoption of the Comprehensive Plan Amendment and approval of the Rezoning. [*Id.* at p. 316]. Pursuant to the County's Program, Southeast then submitted an application to mitigate the transportation impacts of the Project by entering into a proportionate share agreement. [*Id.* at p. 409].

On July 17, 2018, the Board of County Commissioners held a public hearing and approved the Comprehensive Plan Amendment, the Rezoning, and a Concurrency and Impact Fee Credit Agreement (the "Agreement") wherein Southeast Development would pay approximately $15 million toward roadway improvements to address the anticipated impacts of the Project on State Road 16. [*Id.* at p. 304]. Shortly thereafter, on October 1, 2018, Southeast Development executed an Assignment of Development Rights to Southeast Land, as follows:

> [Southeast Development] hereby sells, assigns, transfers, conveys and allocates to [Southeast Land] all of [Southeast Development's] present and future rights, title and interest, if any, relating to the Property in the following (herein collectively called "**Development Rights**"): existing permits, approvals, rights, plans, reports, studies, site plans, surveys, marketing and engineering studies and reports, engineering plans, warranties, utility rights and capacities including all water and sewer agreements, guaranties, bonds and similar rights and interests relating solely to the Property, including but not limited to, all site improvement construction plans and engineering drawings together with all other planned unit development rights, entitlements and concurrency and

6

impact fee credit agreements pertaining to or benefitting the Property issued by St. Johns County, Florida, the St. Johns River Water Management District, the U.S. Army Corps of Engineers, and any other governmental agency having jurisdiction over the Property.

[D.E. #48-16, pp. 1–2] (the "Assignment of Development Rights"). Southeast Development did not assign, nor did Southeast Land accept, any of the obligations associated with the Development Rights.

## III.     The Concurrency and Impact Fee Credit Agreement.

The Agreement was executed and recorded on September 21, 2018, approximately two (2) months after it was approved by the Board. [D.E. #48-15]. It requires Southeast Development to pay $15 million in exchange for a certificate of concurrency allowing development of up to 674 non-age-restricted single-family residential units, 325 age-restricted single-family residential units, 100,000 square feet of commercial space, and 50,000 square feet of office space with related amenities. [*Id.* at pp. 3–5, §§ 2(a), 3, 4(c)]. That certificate of concurrency, as well as all of Southeast Development's rights under the Agreement, was assigned to Southeast Land pursuant to the Assignment of Development Rights. [D.E. #48-16].

Under the Agreement, Southeast Development's $15 million payment includes $10,132,643.00 in proportionate share contribution, calculated based upon "the opinion of probable construction costs estimate [sic] to improve **all deficient roadways**" plus $4,867,357.00 in public benefit contribution ("Public Benefit

7

Contribution") (collectively the "Total Project Transportation Contribution"). [D.E. #48-15, pp. 4–5, §§ 4(a)-(c)]. The Agreement contemplates that Southeast Development will use the Total Project Transportation Contribution to widen a three-mile stretch of State Road 16 between San Giacomo Road and the eastern entrance to the Project (the "SR 16 Improvements"). [*Id.* at p. 5, § 4(d)]. In the event some other entity constructs or funds the SR 16 Improvements, the Total Project Transportation Contribution is still payable to the County as mitigation for the Project's impacts. [*Id.* at p. 8, § 4(e)(v)].

The Agreement also required the County to add the SR 16 Improvements to its Five-Year Schedule of Capital Improvements at the next scheduled update. [*Id.* at p. 11, § 6(c)]. The Capital Improvements Schedule is for the County to plan infrastructure and determine what funds are coming in from which sources. [D.E. #48-12, p. 137:12-19]. To date, nearly six (6) years after the Agreement became effective, the County has not added the SR 16 Improvements to its Five-Year Schedule of Capital Improvements. [D.E. #49-11, p. 37:25-38:4]. According to Joy Andrews, the current County Administrator, the County typically undertakes capital improvement planning five (5) years into the future, and the County updates its Capital Improvements Schedule on an <u>annual</u> basis. [D.E. #48-2, p. 16:3-14; D.E. #48-6, p. 190:8-11]. Ms. Andrews noted the significance of projects being included in the Capital Improvements Schedule, emphasizing that projects in the Capital

Improvements Schedule are those which the Board wants to consider in the next five (5) years and which reflect the community's needs. [D.E. #48-2, p. 17:13-18:1].

A.     **The Land Development Traffic Analysis and Engineer's Opinion of Probable Cost.**

Southeast Development retained a number of expert consultants to support its Comprehensive Plan Amendment and obtain the County's concurrency determination. [D.E. #48-3, p. 16:17-24]. One such expert consultant was Rajesh Chindalur, a traffic engineer with Chindalur Traffic Solutions, Inc., who performed a Land Development Traffic Analysis (LDTA). The LDTA is a requirement for a comprehensive plan amendment and the data contained therein was supplied by the County and used to support the concurrency application. [D.E. #48-4, p. 13:23-15:3]. During the County's concurrency process, it was determined that there was inadequate capacity on both International Golf Parkway and State Road 16 to accommodate impacts from the build out of Grand Oaks. As a result, Mr. Chindalur used the guidelines and formula contained within the County's LDC to calculate a proportionate share of $10,132,643.00 ("Proportionate Share Amount"). [*Id.* at p. 35:4-20]. County staff reviewed Mr. Chindalur's calculation, provided comments, and instructed Mr. Chindalur to make specific changes so the County would approve the project. [*Id.* at p. 36:12-37:18; 54:1-9; D.E. #48-3, p. 128:8-18]. Prior to the Board considering Southeast Development's formal transportation concurrency application, Southeast Development's consultants and representatives engaged in

9

continued negotiations with County staff to reach a meeting of the minds as to the proposed Agreement. [D.E. #48-3, p. 63:12-24; 90:4-22; 100:14-22].

Mr. Chindalur testified that he followed the County's guidelines in calculating the Project's proportionate share "because that [was] what the County [was] going to accept" [D.E. #48-4, p. 35:18-20] and that he was required to follow the County's guidelines "otherwise the County would not accept the studies and approve the project." [*Id.* at p. 54:7-9]. Mr. Chindalur used the County's data contained within the County's transportation analysis spreadsheet to conduct his LDTA and to calculate Southeast Development's proportionate share. [*Id.* at p. 48:24-51:4]. Using the County's data and formula, Mr. Chindalur's original proportionate share calculation was $8,872,797.00, but after County staff asked him to use both an urban section and certain cost variables, the result increased by approximately $1.3 million to reflect the final Proportionate Share Amount. [*Id.* at p. 79:5-80:13].

Mr. Chindalur also prepared Exhibit C to the Agreement, the Engineer's Opinion of Probable Cost for the improvements to State Road 16 (the "Cost Estimate"). Exhibit C was incorporated into the Agreement and used to define the phrase "SR 16 Improvements," as follows:

> The Applicant shall use its Total Project Transportation Contribution to widen an approximately three (3) mile-segment of State Road 16 between San Giacomo Road and the eastern entrance into Grand Oaks from two (2) lanes to four (4) lanes, in the location depicted in **Exhibit "C"**

attached hereto and incorporated herein by reference (the
"**SR 16 Improvements**").

[D.E. #48-15, p. 5, § 4(d)] (emphasis in original). The Cost Estimate contained line items describing the work to be done and cost per unit, generally representing the scope of work for the SR 16 Improvements. [D.E. #48-11, p. 107:3-16].

Exhibit C was incorporated into the Agreement to show the projected cost of the identified scope of work for the SR 16 Improvements. [D.E. #48-4, p. 94:23-95:1]. The total projected cost was $15,013,392.49. [D.E. #48-15, p. 5, § 4(d); p. 26]. County staff reviewed the Cost Estimate and found that it complied with County and FDOT guidelines. [D.E. #48-4, p. 37:17-38:3]. The County accepted the Cost Estimate as incorporated into the Agreement by way of its execution of the Agreement. [D.E. #48-15, p. 20].

## B. Payments and Triggers under the Agreement.

As Grand Oaks is developed, Southeast (or its assignee) is required to make payments to the County on a per unit basis at the time of plat approval up to the Total Project Transportation Contribution. The County has accepted $5,040,000 in payments under the Agreement. [D.E. #48-7, p. 18:22-25].

The Agreement contains a variety of triggers which require certain things to be accomplished within specific time frames. Southeast was required to commence acquisition of pond sites, which would provide drainage for the project, and commence design of the SR 16 Improvements no later than 60 days after the

effective date of the Agreement. [D.E. #48-15, pp. 5–6, § 4(e)(i)]. Southeast must complete pond acquisitions and road design prior to the earlier of (1) fourteen (14) months from the effective date of the Agreement, or (2) the Board's approval of a plat containing the project's 443rd residential unit, referred to as the "Design Period." [*Id.* at p. 6, § 4(e)(ii)].

Within thirty (30) days after the Design Period ends, Southeast must apply for and pursue all permits and required governmental approval for the SR 16 Improvements. Southeast must obtain all required permits within one (1) year of the end of the Design Period. [*Id.* at pp. 6–7, § 4(e)(iii)].

Finally, Southeast must achieve commencement of construction of the SR 16 Improvements prior to the earlier of (1) the Board's approval of a plat containing the project's 581st residential unit, or (2) one hundred eighty (180) days following receipt of a Commencement Notice. [*Id.* at p. 8, § 4(e)(v)]. The Commencement Notice is a defined term in the Agreement and means "a written notice from the County to the Applicant indicating that the traffic capacity of State Road 16 has reached 90 percent of its level of service volume (1,971 peak hour trips)." [*Id.*].

Southeast retained Bill Schaefer with Dominion Engineering Group to initiate land development design and permitting for Grand Oaks. [D.E. #48-10, p. 11:5-12]. Mr. Schaefer assisted with the initial rezoning and PUD application, then was retained to design the common master infrastructure for the first phase of

construction, design the widening of State Road 16, and design a 20-inch water main that would come down future County Road 2209. [*Id.* at p. 17:8-21]. Mr. Schaefer also assisted with locating the pond sites that would work with the design of the SR 16 Improvements. [*Id.* at p. 48:3-13]. As of February 17, 2020, two pond sites were under contract and the remaining site(s) had yet to be identified. [*Id.* at p. 47:14-49:11].[4] Generally, the extent of stormwater retention needed for a road project cannot be determined until the design is approximately 60% completed. [*Id.* at p. 50:4-8].

As of August 2021, Mr. Schaefer had 60% completed plans for the SR 16 Improvements for Phase 1, which covered the area from the Turnbull Creek Bridge south, and submitted them to both the Florida Department of Transportation ("FDOT") and the County. [*Id.* at p. 76:14-22; 83:3-84:25]. He also completed 60% of the plans for the portion north of the bridge, but FDOT requested a different typical section in August 2021.[5] [*Id.* at p. 77:11-78:3]. FDOT's proposed new typical section required a complete redesign by Mr. Schaefer and was very expensive for a number of reasons. [*Id.* at p. 81:4-19]. Among other things, the new typical

---

[4] However, the land for the remaining ponds had been identified and Southeast was prepared to convey that land to the County after the CIFA Amendment was approved. [D.E. #48-9, p. 86:2-6].

[5] A "typical section" shows the pavement for a project in a cross-section, and incorporates things such as medians, sidewalks, swales, and piping. [*Id.* at p. 59:13-60:1].

section would require relocation of the utilities from beneath the roadway [*Id.* at p. 92:17-93:12], it required payment for tree mitigation, it required adding wetland mitigation, and it increased the width of the pavement to accommodate pedestrian crossing bridges. [*Id.* at p. 97:14-98:7]. Ms. Trantham also recalls FDOT imposed additional requirements beyond what was contemplated in the Agreement. [D.E. #48-12, p. 106:21-107:13].

As a result of these significant changes by FDOT, as well as increased construction costs across the board, Mr. Schaefer prepared a new cost estimate, reflecting a cost of over $57 million to complete the SR 16 Improvements as prescribed by FDOT. Southeast transmitted the new cost estimate to the County in February 2022. [D.E. #48-10, p. 204].

The undisputed facts demonstrate that Southeast had completed commencement of acquisition of the ponds and road design as required by the Agreement. [D.E. #48-9, p. 79:20-80:82:22; D.E. #48-17, p. 2] (County admits that Southeast commenced acquisition of the ponds and road design pursuant to the Agreement).

Pursuant to the Agreement, Southeast must also complete pond acquisitions and road design prior to the earlier of (1) fourteen (14) months from the effective date of the Agreement, or (2) the Board's approval of a plat containing the project's 443rd residential unit. [D.E. #48-15, p. 6, § 4(e)(ii)]. The County admits that as of

February 21, 2023, the plat containing the 443rd residential unit in Grand Oaks had not been approved. [D.E. #48-17, p. 2]. The undisputed facts reflect that the County and representatives from Southeast were engaged in near constant communication from the date the Agreement was executed up until February 21, 2023. [D.E. #48-3, p. 135:10-13; D.E. #48-9, pp. 124:5-14, 128:16-129:8, 133:21-134:3, 139:17-140:2, 150:12-24; D.E. #48-6, pp. 37:20-38:20, 66:10-68:1, 137:10-25; D.E. #48-12, pp. 127:14-129:25, 106:17-107:1, 111:19-114:7, 115:21-116:20; D.E. #48-13, pp. 60:17-25, 79:21-80:21, 102:6-104:1, 204:6-206:3).

On November 27, 2018, Southeast gave the County notice that it intended to exercise its ability to toll and extend deadlines pursuant to three (3) separate states of emergency for the Grand Oaks PUD: (1) the opioid epidemic; (2) Hurricane Maria, and (3) Hurricane Florence. [D.E. #48-20]. On March 5, 2020, Southeast gave notice of intent to exercise tolling and extension for Grand Oaks under the state of emergency related to Hurricane Dorian. [D.E. #48-21]. On August 28, 2021, Southeast gave notice of intent to exercise tolling and extension under the state of emergency for COVID-19 related to the Grand Oaks project. [D.E. #48-22].

In July 2022, Jim Knight, Urban Transportation Development Manager with FDOT, instructed Southeast to stop engineering efforts on the SR 16 Improvements. [D.E. #48-10, p. 100:12-101:10; D.E. #48-9, p. 88:7-16, 147:17-149:4; D.E. #48-8, p. 92:15-93:9]. As a result, Southeast halted all design work. On October 27, 2022,

FDOT's directive was conveyed to County staff involved in the Grand Oaks project. [D.E. #48-12, p. 131:16-133:2].

Additional obligations pursuant to the Agreement are as follows:

1. Apply for and pursue all FDOT, environmental and other permits and required governmental approval for the SR 16 Improvements . . . within thirty (30) days following the end of the Design Period and . . . have obtained all required Permits within one (1) year of the end of the Design Period . . .

2. Achieve commencement of construction of the SR 16 Improvements before the earlier of (1) the Board's approval of a plat containing the 581st residential unit or (2) one hundred eighty (180) days following receipt of a Commencement Notice. The Agreement defines "Commencement Notice" as written notice from the County to Southeast indicating that traffic capacity has reached 90 percent of its level of service volume. This sub-subparagraph further defines "Commencement" as "the Applicant posting a bond for the SR 16 Improvements with FDOT in a form and amount to be determined by FDOT by separate agreement or approval with the Applicant for same."

3. Achieve completion of construction within three (3) years of Commencement.

[*See generally* D.E. #48-15, pp. 6–8, §§ 4(e)(iii), (v), (vi), and (vii)].

The County admits that as of February 21, 2023, the plat containing the 581st residential unit in Grand Oaks had not been approved and the level of service volume for State Road 16 was less than 90%. [D.E. #48-17, p. 2]. The County further admits that it had not provided Southeast with a Commencement Notice as of February 21, 2023. [*Id.* at p. 2]. Additionally, Ms. Trantham with the County concedes that

16

commencement had not yet been triggered as of February 21, 2023, so the three-year time frame for completion of the SR 16 Improvements had not yet begun to run. [D.E. #48-12, p. 186:16-24].

### C. CIFA Amendment

After Mr. Schaefer's  cost estimate of more than $57 million to design and construct the SR 16 widening, and FDOT instructed Southeast to stop engineering efforts related to the SR 16 Improvements, Southeast began negotiating an amendment to the Agreement with County staff (the "CIFA Amendment").  [D.E. #48-12, p. 51:1-8; D.E. #48-13, pp. 16:21-17:1, 60:13-25, 64:13-16, 86:1-13]. Southeast also began discussing the CIFA Amendment with FDOT.  [D.E. #48-8, p. 113:5-114:6].  Southeast exchanged numerous drafts of the CIFA Amendment with County staff over the course of months. [D.E. #48-13, pp. 16:21-17:1, 60:13-25, 64:13-16, 86:1-13].

The proposed CIFA Amendment required that Southeast pay $15 million to FDOT, who would then commence design and widening of a longer roadway segment which included the segment described in the Agreement.  [D.E. #48-13, p. 323].  In August 2022, the County wrote a letter to FDOT which described the County's "strong intent to convey, not to exceed, $15,000,000 to FDOT toward the construction of State Road 16," and which urged FDOT "to begin the project design phase of construction of State Road 16 by FY23 and include the completion of State

Road 16 in a 5-year work plan." [*Id.* at p. 280]. Other than a few minor comments from County staff, no one at the County told Southeast that the CIFA Amendment was unacceptable. [D.E. #48-12, pp. 53:24-54:7; 57:14-58:5]. As of February 16, 2023, only a week prior to the Board's consideration of the CIFA Amendment, County staff was exchanging redline versions of the CIFA Amendment with representatives of Southeast. [*Id.* at p. 118:3-119:15].

On February 21, 2023, Southeast appeared before the Board on the CIFA Amendment. The CIFA Amendment was the only item related to Grand Oaks which was on the Board's agenda. [*Id.* at p. 66:1-3]. Southeast's counsel requested a continuance of the Board's consideration of the CIFA Amendment because they were still engaged in negotiations with County staff over a number of proposed items. The Board denied Southeast's request for a continuance and proceeded with consideration of the CIFA Amendment. After presentation from County staff and Southeast, public comment, and comments from the Commissioners, the Board voted 5-0 to deny the CIFA Amendment. [D.E. #47-2, p. 170:9-171:23].

Immediately thereafter, with no notice to Southeast or any of its representatives, and without having the matter placed on the agenda, Commissioner Arnold moved to find Southeast in default of the Agreement based upon the following factual findings:

(1) The developer has failed to honor contractual commitments to widen approximately 3.1 miles of State Road 16 and phase its subdivision to coincide with the commencement of the road widening construction; and

(2) These contractual commitments are material to the agreement and material to the Board's prior decisions to approve the developer's comprehensive plan amendment and PUD rezoning applications to accommodate the subdivision.

Commissioner Arnold then requested the $5.04 million in per unit payments collected pursuant to the Agreement be declared non-refundable and be transferred to FDOT to fund the SR 16 Improvements. The Board voted 5-0 to find Southeast in default of the Agreement and disburse the funds to FDOT. This motion was drafted for Commissioner Arnold by Senior Assistant County Attorney Christine Valliere at Commissioner Arnold's request approximately one week before the hearing.[6] [D.E. #48-13, p. 231:21-234:2]. No one else at the County who was involved in reviewing the CIFA Amendment knew that the Board was going to find Southeast in default. [D.E. #48-12, pp. 58:22-59:10; D.E. #48-2, p. 180:24-181:1; D.E. #48-6, p. 105:9-21]. Southeast was completely blindsided by the default motion, as it was under the impression that negotiations on the CIFA Amendment were still ongoing. [D.E. #48-8, pp. 112:2-115:12].

---

[6] It is important to note that Southeast and the County were still exchanging redlines of the CIFA Amendment while this motion for default was being discussed and drafted. [D.E. #48-13, p. 204:6-205:5].

## IV. Course of Proceedings and Disposition Below.

On March 14, 2023, Southeast Development filed a civil action against the County in the Circuit Court of the Seventh Judicial Circuit in and for St. Johns County.[7] [D.E. #1, p. 2]. In responding to the original complaint, the County filed a counterclaim against Southeast Development and third-party complaints against Southeast Ventures and Day Late. Southeast Development sought leave to amend and its Amended Complaint, joining Southeast Land as co-plaintiff, was deemed filed on June 26, 2023. [D.E. #1, p. 2].

The Amended Complaint alleged four causes of action against the County: (1) declaratory judgment that the County's interpretation of the Agreement as requiring Southeast Development to construct the SR 16 Improvements regardless of cost is invalid, that Southeast Development is not in default of the Agreement, and prohibiting the County from enforcing its default finding; (2) breach of the Agreement for failing to adopt the SR 16 Improvements into its Five-Year Schedule of Capital Improvements, failing to properly account for Per Unit Payments, failing to maintain a separate escrow account, erroneously finding Southeast Development in default of the Agreement, and failing to cooperate with Southeast Development

---

[7] The District Court's Order incorrectly identifies Southeast Land as co-plaintiff on the original state court complaint filed by Southeast Development on March 14, 2023. [D.E. #69, p. 10]. Southeast Land was not involved in this action until the County filed its third-party complaint, and was later added as a co-plaintiff to the Amended Complaint.

to effectuate the terms of the Agreement; (3) inverse condemnation based on the County seizing the Escrow Funds; and (4) an action under 42 U.S.C. § 1983 for an unlawful exaction in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution. [D.E. #5].

In responding to the Amended Complaint, the County also filed an Amended Counterclaim for Declaratory Judgment and Supplemental Relief [D.E. #16, p. 21] ostensibly dropping its third-party complaints against Southeast Ventures and Day Late and instead impleading Day Late under Florida Rule of Civil Procedure 1.170.[8] The County then timely removed the matter to the District Court, as the Amended Complaint presented a federal question, thereby providing a sufficient basis for subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367. [D.E. #1, pp. 3–4].

On the eve of the deadline to amend the pleadings, the County filed a Second Amended Counterclaim for Declaratory Judgment and Supplemental Relief ("Second Amended Counterclaim") [D.E. #31]. The Second Amended Counterclaim includes two counts against Southeast Development, Southeast Land, and Day Late

---

[8] The District Court's Order incorrectly states that the County filed counterclaims against Southeast Development and Southeast Land and impleaded Day Late in response to the original state court complaint. [D.E. #69, p. 10].

(now impleaded under Federal Rule of Civil Procedure 19).[9] Count I sought a judgment declaring that Southeast Development and Southeast Land are obligated to pay all costs for the SR 16 Improvements and finding Southeast Development and Southeast Land in breach for failing to comply with the Agreement [D.E. #31, pp. 15–16]. Count I also requested a judgment declaring the County's rights and authority to (1) halt approval and construction of additional plats, (2) retain the Escrow Funds, and (3) require Southeast Development and Southeast Land to assign certain design documents and permits to the County.[10] [D.E. #31, pp. 16–17]. In the alternative, Count II sought specific performance [D.E. #31, pp. 17–19].

On April 26, 2024, the parties filed cross motions for summary judgment. [D.E. #44, #47]. The motions were fully briefed on May 31, 2024. [D.E. #50–53]. On September 13, 2024, the District Court entered its Order [D.E. #69] and Judgment [D.E. #70] granting the County's motion for summary judgment on Counts I, II, III, and IV of the Amended Complaint and Count I of the Second Amended Counterclaim, and denying Appellants' motion for partial summary

---

[9] The District Court later ordered that Day Late be dropped as a party pursuant to Federal Rule of Civil Procedure 21. [D.E. #68]. Day Late is not a party to this appeal.

[10] The District Court's Order incorrectly characterizes Count I of the Second Amended Counterclaim as requesting a declaration of the County's rights based upon Southeast Land's breaches of the Agreement [D.E. #69, p. 11]. Count I is plead against both Southeast Development and Southeast Land. Further, as detailed below, Southeast Land is not a party to the Agreement, has not been assigned any obligations thereunder, and as such cannot be found in breach.

judgment. The District Court declared that "[Southeast Land] is obligated to pay all costs for the SR 16 Improvements, and [Southeast Land] breached the Agreement by failing to comply with the Agreement's terms." [D.E. #70]. The District Court further declared that the County had the authority under the Agreement to halt approval of additional plats, declare the Escrow Funds nonrefundable, and require Southeast Land to assign design documents and permits to the County at no cost. [D.E. #70].

## STANDARD OF REVIEW

This Court reviews orders on summary judgment de novo, applying the same standard as the District Court. *Hearn v. McKay*, 603 F.3d 897, 901 (11th Cir. 2010). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## SUMMARY OF THE ARGUMENT

District Court erred in granting summary judgment in favor of the County on Counts I and II of the Amended Complaint and Count I of the Second Amended Counterclaim. As an initial matter, the District Court erred when it found Southeast Land liable for breach of the Agreement. The Assignment of Development Rights between Southeast Development and Southeast Land did not transfer any of Southeast Development's liabilities or obligations under the Agreement to Southeast

Land.   As a result, Southeast Land cannot be held liable for breaching the Agreement, which is contrary to the District Court's finding.   The District Court further erred in finding that the Agreement required Southeast Land to construct the SR 16 Improvements, regardless of cost.   Such an interpretation of the Agreement yields both an absurd and an illegal result and is violative of Section 163.3180 and the County's own Concurrency Management Ordinance.   The District Court erred in its finding that Southeast Development breached the Agreement, because the deadlines pursuant to the Agreement were tolled due to several emergency declarations.   Therefore, Southeast Development's obligations under the Agreement have not yet been realized.   Finally, the District Court ignored undisputed evidence of the County's breach of the Agreement.   As a result, the District Court's Order should be reversed and summary judgment entered in favor of Southeast Development and Southeast Land as to Counts I and II of the Amended Complaint and Count I of the Second Amended Counterclaim.

The District Court erred in its finding that the County was entitled to summary judgment as to Count IV of the Amended Complaint.   As a threshold matter, the District Court erred when it failed to evaluate whether Southeast Development had standing to bring Count IV.   Further, there are disputed material facts related to whether the County's monetary exactions bear an essential nexus to a legitimate state interest and are not roughly proportional to the Grand Oaks Project impacts.   The

District Court acknowledged this two-part test in its Order, yet failed to evaluate whether the County's monetary exactions were roughly proportional to the impacts of the Grand Oaks development. Therefore, the District Court's Order should be reversed as to Count IV to be reviewed on the merits.

## **ARGUMENT**

**I.** **The District Court erred in granting summary judgment in favor of the County on Count I and II of the Amended Complaint and Count I of the Second Amended Counterclaim.**

In its Order, the District Court found that "the Agreement requires [Southeast Land] to pay all costs for the SR 16 Improvements," [D.E. #69, p. 18], and that the "undisputed facts establish that [Southeast Land] breached the Agreement by failing to satisfy certain material terms within the timeframe to which it was contractually bound." [D.E. #69, p. 23]. For these reasons, the District Court granted summary judgment in favor of the County on Count I and II of the Amended Complaint and Count I of the Second Amended Counterclaim.

As a threshold matter, the District Court's ruling misunderstands the relationship between Southeast Development and Southeast Land and contradicts the plain language of the Assignment of Development Rights. The District Court correctly recognized that Southeast Development assigned its development rights under the Agreement to Southeast Land. [D.E. #69, p. 7]. However, the Assignment

of Development Rights does not transfer any of Southeast Development's obligations or liabilities under the Agreement.

Under Florida law, "[t]he assignment of a personal contract does not give to the other party to the original agreement a right of action against the assignee for its breach, nor is a mere assignee liable unless he expressly agreed to be bound." *Jenkins v. City Ice & Fuel Co.*, 160 So. 215, 217 (Fla. 1935). Further, an assignment of rights under a contract does not include an assumption of obligations or liabilities the assignor may have to other parties to the contract unless expressly agreed to by the assignee. *De La Rosa v. Tropical Sandwiches, Inc.*, 298 So. 2d 471 (Fla. 3d DCA 1974); *Sans Souci v. Div. of Fla. Land Sales & Condos*, 448 So. 2d 1116 (Fla. 1st DCA 1984); *Dependable Ins. Co. v. Landers*, 421 So. 2d 175 (Fla. 5th DCA 1982). As a non-party to the Agreement who has not expressly assumed Southeast Development's obligations or liabilities, Southeast Land has no obligations under the Agreement, least of all an obligation to pay all costs for the SR 16 Improvements. Southeast Land cannot, as a matter of law, be liable for breaching the Agreement.

Assuming arguendo that the District Court found the Agreement requires Southeast Development to pay all costs for the SR 16 Improvements and that Southeast Development breached the Agreement by failing to satisfy certain material terms within the required timeframes, those findings are similarly flawed. For the reasons set forth below, the District Court's Order granting summary judgment in

favor of the County on Count I and II of the Amended Complaint and Count I of the Second Amended Counterclaim should be reversed, with summary judgment instead granted in favor of Appellants on those counts.

### A. The Agreement does not require Southeast Development or Southeast Land to pay all costs for the SR 16 Improvements.

The District Court erroneously found that the Agreement requires Southeast Development to pay all costs for the SR 16 Improvements. [D.E. #69, p. 18]. The District Court's construction leads to an absurd result, violates state law, and fails to comply with the County's own Program. There is no provision in the Agreement stating that Southeast Development is required to build the SR 16 Improvements without cost limitation. The better construction – and one supported by the plain language of the Agreement – caps Southeast Land's liability at the Total Project Transportation Contribution (i.e., $15 million).

A contract cannot be interpreted if such interpretation produces an absurd or illegal result. *Action Nissan, Inc. v. Hyundai Motor America*, No. 22-13153, 2024 WL 3888756 at *7 (11th Cir. Aug. 21, 2024). If "one interpretation of the contract would lead to an absurd result and another interpretation would be consistent with reason and probability, courts should adopt the rational interpretation." *Id.* Indeed, a contract cannot "'be interpreted literally if doing so would produce absurd results, in the sense of results that the parties, presumed to be rational persons pursing rational ends, are very unlikely to have agreed to seek.'" *Bearden v. E.I. du Pont de*

*Nemours and Co.*, 945 F.3d 1333, 1339 (11th Cir. 2019) (citing *Koch Business Holdings, LLC v. Amoco Pipeline Holding Co.*, 554 F.3d 1334, 1338 (11th Cir. 2009)).

The Agreement expressly defines "SR 16 Improvements" as:

> [W]iden an approximately three (3) mile-segment of State Road 16 between San Giacomo Road and the eastern entrance into Grand Oaks from two (2) lanes to four (4) lanes, in the location depicted in **Exhibit "C" attached hereto and incorporated herein by this reference**.

[D.E. #48-15, p. 5, § 4(d)]. Exhibit C (the "Engineer's Opinion of Probable Construction Cost"), is therefore a part of the definition of the "SR 16 Improvements," and contains a detailed list of items to be completed and the estimated cost of each. [D.E. 48-13, p. 121:16-22]. The Agreement makes clear that the definition of "SR 16 Improvements" includes and is "**based on** the written estimate and preliminary design . . . ." [D.E. #48-15, p. 5, § 4(d) (emphasis added)]. The Engineer's Opinion of Probable Construction Cost contemplated an Estimated Total Cost of $15,013,392.49.[11] [D.E. #48-15, p. 5, § 4(d)].

---

[11] The Engineer's Opinion of Probable Construction Cost was developed pursuant to section 163.3180 and the County's Program. As explained above, section 163.3180(5)(h)2 and the County's Program ensure that applicants are not responsible for the cost of reducing or eliminating existing deficiencies and prohibit local governments from imposing costs greater than the development's proportionate share to mitigate the development's impacts.

Despite section 163.3180, the County's Program, and the Engineer's Opinion of Probable Construction Cost, the District Court incorrectly interprets Section 4(e)(vi) of the Agreement and a footnote in Exhibit C to require Southeast Development to "pay for the entirety of the SR 16 Improvements" even though the actual cost is $57 million. Section 4(e)(vi) provides:

> Applicant understands that the Escrow Funds shall not be sufficient to pay the Estimated Total Cost of the SR 16 Improvements and Applicant agrees that it shall pay all costs for the SR 16 Improvements which are in excess of the Escrow Funds.

[D.E. #48-15, p. 8, § 4(e)(vi)]. There is no debate that Section 4(e)(vi) cannot be read in a vacuum, but must be construed with the remaining provisions, including the contractually defined terms "Escrow Funds," "Estimated Total Cost," and "SR 16 Improvements." "Escrow Funds" is defined as the aggregate of the Per Unit Payments. The Per Unit Payments are defined as:

> (a)  Seven Thousand Five Hundred and No/100 Dollars ($7,500.00) per unit within each plat for the first 212 units within the Concurrency Development; and
> (b)  Fifteen Thousand and No/100 Dollars ($15,000.00) per unit within each plat starting with the 213th unit.

[D.E. #48-15, p. 7, § 4(e)(iv)]. "Estimated Total Cost" is defined as "[t]he preliminary engineering cost estimate for the design, permitting and construction of the SR 16 Improvements, including without limitation the Pond Acquisitions . . .

Fifteen Million Thirteen Thousand Three Hundred Ninety-Two and 49/100 Dollars ($15,013,392.49)." [*Id.* at p. 5, § 4(d)].

Assuming all entitled units are platted, the total amount of the Per Unit Payments would be $13,395,000, as County staff acknowledged. [D.E. #48-12, p. 94:8-95:4]. The Escrow Funds are, therefore, less than the Estimated Total Cost of $15,013,392.49. Reading the relevant portion of Section 4(e)(vi) in conjunction with the defined terms therein, it is clear the intent of the Agreement was for Southeast Development to pay the amount in excess of the Escrow Funds, which is slightly less than the $2 million difference between the Escrow Funds and the Estimated Total Cost.

The District Court's interpretation leads to an absurd result because Southeast Land, a reasonable and rational developer, would not have agreed to an unbridled cost of the SR 16 Improvements such that Southeast Land would be required to pay a more than 300 percent increase. Subsection 4(e)(vi) thus cannot be read to expand Southeast Land's obligation to construct the SR 16 Improvements, as specifically defined in the Agreement, to be without limitation on costs. In addition, the District Court's interpretation violates section 163.3180 and the County's LDC because it would require Southeast Land to pay more than its proportionate share to mitigate impacts of the Project. The only plausible interpretation of the Agreement is that

Southeast Land is obligated to pay the difference between the Escrow Funds and the estimated total cost of $15,013,392.49.

The District Court also relies on a footnote in Exhibit C, which provides:

> The above estimated construction costs are based on the attached preliminary design for an ultimate sub-urban section (adding two lanes in one direction) and may vary with actual design and the cost of material at the time of construction.

[D.E. #48-15, p. 26]. The District Court's interpretation of the Exhibit C footnote is similarly unreasonable and leads to the absurd result of requiring Southeast Development to pay for additional FDOT obligations that were not contemplated in Exhibit C or the Agreement. While the footnote allows for variance in the cost of the specific items delineated in Exhibit C, it does not contemplate additional items imposed by other public entities. Under the District Court's interpretation, the County (or another entity) could impose any additional construction and/or development requirements beyond the scope of Exhibit C, and Southeast Land would be forced to pay it regardless of cost. Southeast Land, a rational and reasonable developer, would not have entered into the Agreement if the Agreement does not serve its intended purpose of outlining the scope of obligations and costs for same.

Misreading and interpreting Section 4(e)(vi) and the Exhibit C footnote in a vacuum, as the District Court has, leads to an absurd result, requiring Southeast Land

to construct the SR 16 Improvements even if the cost skyrocketed to one hundred times its Proportionate Share Amount. The Agreement cannot be read to lead to such an absurd and illegal result.

### B.     Southeast Development did not breach the Agreement.

The District Court's Order specifically found breaches of Section 4(d)(ii) of the Agreement, which required completion of Pond Acquisition and Road Design, noting the parties did not dispute that neither item "had been satisfied within the timeframe provided under the Agreement." [D.E. #69, pp. 23-24]. However, as the District Court recognized, the Appellants argued "that the presence of five separate states of emergency in Florida, existing either at the time [sic] of the Agreement or declared during performance, tolled the Pond Acquisition and Road Design deadlines until September 29, 2024." [D.E. #69, p. 24].

In Florida, "[t[he declaration of a state of emergency issued by the Governor for a natural emergency tolls the period remaining to exercise the rights under a permit or other authorization for the duration of the emergency declaration. Further, the emergency declaration extends the period remaining to exercise the rights under a permit or other authorization for 6 months in addition to the tolled period." § 252.363(1)(a), Fla. Stat. In order to exercise the tolling and extension, "within 90 days after the termination of the emergency declaration, the holder of the permit or other authorization shall notify the issuing authority of the intent to exercise the

tolling and extension granted under paragraph (a). The notice must be in writing and identify the specific permit or other authorization qualifying for extension." *Id.* § 252.363(1)(b). Importantly, "[i]f the permit or other authorization for a phased construction project is extended, **the commencement and completion dates for any required mitigation are extended such that the mitigation activities occur in the same timeframe relative to the phase as originally permitted**." *Id.* § 252.363(1)(c). Once the permit holder submits its notice of intent, the extension occurs as a matter of law. Fla. AGO 2012-13 (April 25, 2012).

The Agreement went into effect on September 21, 2018. [D.E. #48-15, p. 1]. At the time, there were two active emergency declarations pending: the Opioid Epidemic and Hurricane Maria. These states of emergency expired on April 1, 2019 and December 16, 2018, respectively. Another emergency declaration – for Hurricane Florence – went into effect on September 14, 2018 and expired on November 13, 2018.

On November 27, 2018, Southeast Development gave notice of its intent to exercise tolling and extension under those three states of emergency to extend the expiration of the Grand Oaks PUD. [D.E. #48-20]. Because Grand Oaks is a phased project, commencement and completion of required mitigation – including the transportation mitigation requirements set forth in the Agreement – were similarly tolled and extended to coincide with the time-frame relative to the phases as

originally permitted. When periods of overlap between the three states of emergency are removed, mitigation deadlines under the Agreement were tolled for 193 days (i.e., from September 21, 2018, when the Agreement went into effect, until the state of emergency for the Opioid Epidemic expired on April 2, 2019).

The original deadline for Southeast Development to complete Pond Acquisition and Road Design was November 21, 2019 (fourteen months from the effective date of the Agreement). Based upon Southeast Development's notice of intent under the Opioid Epidemic, Hurricane Maria, and Hurricane Florence, the deadline was tolled until June 1, 2020. In addition to this tolling, the deadline was then extended by a period of 18 months (6 months per state of emergency), until December 1, 2021. [D.E. #48-20].

A state of emergency for Hurricane Dorian went into effect on August 28, 2019 and expired on June 16, 2020, for a total of 293 days. On March 5, 2020, Southeast Development gave notice of intent to exercise tolling and extension under Hurricane Dorian for the Grand Oaks PUD. [D.E. #48-21]. Based upon the notice of intent, the deadline for Southeast Development to complete Pond Acquisition and Road Design was tolled from December 1, 2021 until September 20, 2022. The deadline was then extended by 6 months in addition to tolling, until March 20, 2023.

A state of emergency for COVID-19 went into effect on March 9, 2020 and expired on June 16, 2021, for a total of 474 days. On August 28, 2021, Southeast

Development gave notice of intent to exercise the tolling and extension under the state of emergency for the Grand Oaks PUD. [D.E. #48-22]. When periods of overlap between the COVID-19 emergency declaration and Hurricane Dorian emergency declaration are removed, 375 days of tolling are available under the COVID-19 declaration. Based upon the notice of intent, the deadline for Southeast Development to complete Pond Acquisition and Road Design was tolled from March 20, 2023 until March 29, 2024. The deadline was then extended by 6 months in addition to the tolling, until September 29, 2024. As a result, the deadline for Southeast Development to complete Pond Acquisition and Road Design under the Agreement had not occurred at the time of the County's default finding.

In response, the County argued that the 2018 version of section 252.363 did not apply to the Agreement because the statute did not expressly include "development agreements" as eligible for tolling and extension until 2021. [D.E. #50, p. 5]. The County further argued that Southeast Development's tolling and extension requests did not comply with the requirement in section 262.363(1)(b) that such requests "identify the specific permit or other authorization qualifying for extension." [D.E. #50, p. 6]. The County's arguments are premised on the incorrect

conclusion that the Agreement is a "development agreement." It is not. The

Agreement is a proportionate share agreement pursuant to section 163.3180.[12]

But even if the Agreement were a development agreement, the tolling and

extensions under section 252.363 still apply because the language regarding

timeframes to commence and complete mitigation for phased development has been

in the statute since its inception. The 2018 version of section 252.363 contained the

following provision, which still exists today:

> If the permit or other authorization for a phased
> construction project is extended, the commencement and
> completion dates for any required mitigation are extended
> such that the mitigation activities occur in the same time
> frame relative to the phase as originally permitted.

§ 252.363(c). The entire purpose of concurrency is to mitigate for impacts of

developments on capital infrastructure. The Agreement is explicitly a transportation

mitigation agreement, a fact that the District Court recognized in its Order. [D.E.

---

[12] The Agreement explicitly states it was entered into pursuant to LDC Section 11.09.04 and section 163.3180, Florida Statutes. [D.E. #48-15, pp. 1, 11]. LDC section 11.09.04 provides the general requirements for a proportionate fair share contribution and LDC section 11.09.05(C) provides that applicants for a proportionate fair share agreement must follow the procedures in St. Johns County Development Review Manual ("DRM") Section 3.10, titled "Proportionate Fair Share Agreement." The County has separately adopted regulations for development agreements in accordance with Florida's Local Government Development Agreement Act. *See* LDC Part 5.05.00, § 11.07.00 and DRM Ch. 4. Importantly, proportionate fair share agreements and development agreements are two distinct types of agreements under the County's regulations and Florida law. *Compare* DRM Section 3.10 and DRM Chapter 4; § 163.3180 and §§ 163.3220-163.3243.

#69, p. 3] ("The Concurrency Agreement would mitigate transportation impacts of the development."). By statute then, the emergency declaration tolling and extensions for the Grand Oaks PUD operated as tolling and extensions for "any required mitigation," which includes the mitigation activities pursuant to the Agreement.[13]

The County also argued that Southeast Development's notices of intent to exercise tolling and extension were not specific enough to put the County on notice that deadlines under the Agreement were included. In doing so, the County cites to one of Southeast Development's notice letters which states the intention to request an extension for "the expiration date of the Grand Oaks Planned Unit Development St. Johns County Ordinance No. 2018-40 (PUB 2017-02)." [D.E. #50, p. 6]. With the exception of the first two notice letters [D.E. #48-19, #48-20], Southeast Development requested an extension for the expiration date of the Grand Oaks Planned Unit Development St. Johns County Ordinance No. 2018-40 (PUB 2017-02) and all related approvals by St. Johns County." [D.E. #48-21 - #48-23]. This

---

[13] Despite recognizing that the Agreement mitigates transportation impacts of the Project, the District Court found the argument that section 252.363 extends mitigation efforts "inapposite when, as here, there is no permit." [D.E. #69, p. 26, n. 27]. The District Court misunderstands that the underlying development order being tolled and extended is the Grand Oaks PUD. The Agreement mitigates transportation impacts from the Grand Oaks PUD, and therefore the commencement and completion dates set forth in the Agreement are automatically extended concurrently with the PUD.

language clearly demonstrates an intent to extend all approvals related to the Grand Oaks PUD, which would include the Agreement. To the extent the first two notice letters were not specific enough to include the Agreement, section 252.363(c) still serves to automatically extend all mitigation activities, including all deadlines in the Agreement.[14]

By operation of five separate states of emergency in Florida over the course of the Agreement, the deadlines to complete Pond Acquisition and Road Design were tolled and extended through September 29, 2024. For each state of emergency, Southeast Development provided the County with notice of its intent to exercise the statutory tolling and extensions, notices that the County accepted and processed. As a result, the deadline for Southeast Development to complete Pond Acquisition and Road Design under the Agreement had not occurred at the time of the County's default finding (or at the time of the District Court's Order in the proceedings below), and Southeast Development was not in breach of the Agreement.

### C. The County breached the Agreement.

---

[14] The District Court's Order finds Southeast Development's notices were facially deficient because "no specific permits were identified by the notices in the EO extension notices, as it is undisputed that no permits had been acquired for the relevant Pond Acquisition or Road Design sought to be extended." [D.E. #69, p. 26, n. 28]. Again, the District Court fails to understand that the underlying development order being extended is the Grand Oaks PUD, which the notices do expressly identify. The Agreement, including the Pond Acquisition and Road Design, is mitigation for the Grand Oaks PUD and is therefore automatically extended under section 252.363(c).

The undisputed facts reflect that the County never adopted the SR 16 Improvements into its Five-Year Schedule of Capital Improvements in the Capital Improvements Element of its Comprehensive Plan. Section 163.3177(3)(a) requires that comprehensive plans contain a Capital Improvements Element ("CIE"). Section 163.3177(3)(b) requires that local governments review the CIE on an annual basis. The County evaluates each project in its Capital Improvements Plan each fiscal year before the projects are approved within the budget. Despite this, the County has failed to incorporate the SR 16 Improvements into its Five-Year Schedule, which is a clear breach of the Agreement.

The County Administrator spoke to the significance of incorporating a project into the Capital Improvements Plan, i.e. that the project reflected a community need that should be considered within the next five (5) years. By failing to incorporate the SR 16 Improvements in its Capital Improvements Plan as required to under the Agreement, the County has deprived Southeast Development and Southeast Land of having the SR 16 Improvements be given some level of priority by the County as well as visibility to the general public. Neither Southeast Development nor Southeast Land had an adequate remedy at law as to this breach, as there were no quantifiable money damages which could rectify the County's failure.

In finding no breach by the County, the District Court stated that "SELV fails to support its conclusory allegation that the County breached this term by pointing

to any specific instance where the County had an opportunity to adopt the items into its Comprehensive Plan but refused." [D.E. #69, p. 31]. The District Court, like the County, confuses the CIE with the Capital Improvements Schedule. As argued below, the two are not the same. The County is not required to review the CIE on an annual basis, and generally a modification to the CIE requires a Comprehensive Plan amendment. However, the Capital Improvements Schedule can statutorily be modified by ordinance, without requiring an amendment to the Comprehensive Plan. *See* § 163.3177(3)(b). Further, the County's Assistant Director of Transportation testified that the County updates its Capital Improvements Schedule on an <u>annual</u> basis. [D.E. #48-6, p. 190:8-11]. This is done in conjunction with the budget approval process. [*Id*. at p. 188:13-189:3].

The District Court states that "the term of the Agreement does not specify when such adoption should occur." To the contrary, the Agreement states that the adoption shall occur "at the next scheduled update." [D.E. #48-15, p. 11, § 6(c)]. Based upon the County's statutory obligation to review the implementation of the CIE on an annual basis and the Assistant Director of Transportation's testimony that the Capital Improvements Schedule is updated on an annual basis, the undisputed facts establish that the County had the opportunity to adopt the SR 16 Improvements into its Capital Improvements Schedule but failed to do so.

As noted in the Motion for Partial Summary Judgment, the failure to incorporate a project in the Capital Improvements Schedule deprived Southeast Development and Southeast Land from having the SR 16 Improvements be given a level of priority at the County. [D.E. #48-11, p. 37:25-38:4]. Had the County incorporated the SR 16 Improvements into the Capital Improvements Schedule, it could have entered into other proportionate share agreements to put funds towards the roadway or identified other funding sources. [D.E. #46-37, p. 47, § 11.09.08) ("There is hereby created a new special revenue fund called the Proportionate Fair Share Fund where individual projects will be established and to which proportionate fair share payments shall be made pursuant to this Program. Revenue from this fund **shall be used toward funding of scheduled improvements in the Capital Improvements Element** of the Comprehensive Plan . . ."). Southeast Development and Southeast Land missed out on additional funding opportunities as a result of the County's breach. The County had multiple opportunities to incorporate the SR 16 Improvements into its Capital Improvements Schedule, as at least four (4) budgets were approved between the execution of the Agreement and the default finding, but the County indisputably failed to do so. As a result, the District Court's finding that the County did not breach the Agreement should be overturned.

## II. The District Court erred in granting summary judgment in favor of the County on Count IV of the Amended Complaint.

### A. Both Southeast Development and Southeast Land have Standing to Bring Count IV.

The District Court found that only Southeast Land had standing to bring a claim of unlawful exaction against the County, but failed to perform an analysis as to Southeast Development's standing, erroneously citing a footnote of a case where the District Court found that each plaintiff had standing to bring the case. *See Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, n. 2 (2006).

Both Southeast Development and Southeast Land have standing to raise Count IV of the Amended Complaint. If a plaintiff has standing to file an application before a local government, then that same plaintiff also has standing to file a constitutional claim. *See Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 261–263 (1977) (holding nonprofit housing corporation has constitutional standing to file action challenging denial of rezoning application based on Equal Protection, Fourteenth Amendment, and Fair Housing Act violations because its contract to purchase the property was contingent upon securing the rezoning approval); *Sullivan Prop., Inc. v. City of Winter Springs*, 899 F. Supp. 587, 592 (M.D. Fla. 1995) (holding that the borrow pit permit applicant had constitutional standing to challenge the City's denial of the permit even though the applicant was

not the property owner because the applicant "controlled the property and was authorized to act on behalf of the property's owner").

Southeast is the Applicant to the Agreement and is defined as the "Applicant" in the Agreement. The District Court erred when it failed to evaluate whether Southeast Development had standing to pursue Count IV.

B.  **The County's monetary exactions do not bear an essential nexus to a legitimate state interest and are not roughly proportional to the Grand Oaks Project impacts.**

The District Court erred in entering summary judgment on 42 U.S.C. § 1983 because the County's unlawful monetary exactions lack an essential nexus to a legitimate state interest and were not roughly proportionate to the impacts of the Grand Oaks Project (i.e., compelling Southeast Development to construct the SR 16 Improvements at nearly **four times** the amount contemplated by the Agreement).

The United States Supreme Court has held that governmental authority to impose such exactions is circumscribed by the Fifth and Fourteenth Amendments and the unconstitutional conditions doctrine. *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 834 (1987). *See also Dolan v. City of Tigard*, 512 U.S. 374, 383 (1994). Pursuant to Article X, Section 6(a) of the Florida Constitution, "[n]o private property shall be taken except for a public purpose and with full compensation therefor paid to each owner or secured by deposit in the registry of the court and available to the owner." One of the primary purposes of this constitutional takings

clause is "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

Courts have long held – and in a variety of contexts – that "the government may not deny a benefit to a person because he exercises a constitutional right." *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 545 (1983). These holdings reflect the principle, known as the unconstitutional conditions doctrine, "that vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013).

As the U.S. Supreme Court discussed in *Koontz*, the Court's prior decisions in *Nollan* and *Dolan* involve a special application of the unconstitutional conditions doctrine "that protects the Fifth Amendment right to just compensation for property the government takes when owners apply for land-use permits." 570 U.S. at 604 (citing *Lingle v. Chevron*, 544 U.S. 528, 547 (2005)). In order to impose conditions on the issuance of a permit without effecting a taking, the government must demonstrate: (1) an "essential nexus" between the exaction and a legitimate public purpose for which the exaction is being imposed; and (2) that the exaction is "roughly proportionate" to the impacts of the proposed development. The government has the burden of demonstrating compliance with this test. *Nollan v.*

*California Coastal Comm'n*, 483 U.S. 825, 837 (1987); *Dolan v. Tigard*, 512 U.S. 374, 391 (1994). Under *Nollan* and *Dolan*, "the government may choose whether and how a permit applicant is required to mitigate the impacts of a proposed development, but it may not leverage its legitimate interest in mitigation to pursue governmental ends that lack an essential nexus and rough proportionality to those impacts." *Koontz*, 570 U.S. at 606.

The underlying principles from *Nollan* and *Dolan* apply "regardless of whether the government ultimately succeeds in pressuring someone into forfeiting a constitutional right." *Id.* This is because "[e]xtortionate demands for property in the land-use permitting context run afoul of the Takings Clause not because they take property but because they impermissibly burden the right not to have property taken without just compensation." *Id.* at 607. Further, *Nollan* and *Dolan* also apply to a government's demand for money, specifically where the government demands that an owner spend money to make improvements to government-owned property. *Id.* at 613.

The District Court incorrectly asserts that the monetary exactions in the Agreement do not bear an essential nexus to a legitimate public purpose because "the Agreement mitigates transportation impacts of the development, a legitimate state interest upon which a permit may be conditioned." Order, p. 45. In *Koontz*, the St. Johns River Water Management District agreed to approve construction "only if

45

[the applicant] agreed to one of two concessions." *Koontz*, 570 U.S. at 601. One option was a 13.9-acre conservation easement and the other was a monetary obligation to hire contractors for improvements on District-owned land. *Id.* at 602. Without complying with one of these concessions, the District would deny the applicant's permits. *Id.* at 601–602.

Similarly, here, the County required Southeast Development to enter into the Agreement, which provides that Southeast will pay $15 million in exchange for a certificate of concurrency allowing for the development of up to 674 non-age-restricted single-family residential units, 325 age-restricted single family residential units, 100,000 square feet of commercial space, and 50,000 square feet of office space with related amenities. Motion, p. 8. Without this contribution, or the contribution or construction of land or facilities, or a combination thereof, the County would not have approved the Grand Oaks PUD. LDC § 11.09.06.A. The problem lies in that, under the District Court's interpretation of the Agreement, an increase from $15 million to $57 million to mitigate transportation impacts fo*r the exact same project* cannot bear an essential nexus to the legitimate public purpose.

The District Court attempts to distinguish *Koontz* by stating that the Agreement was not required as part of the Grand Oaks PUD approval ("unlike *Koontz*, approval of the development was not predicated on an agreement of concessions called for by the County"), but in the same Order states that the County's

LDC "required SEDP to enter into a Concurrency and Impact Fee Credit Agreement . . . with the County to initiate the Grand Oaks PUD." D.E. #69, p. 3; p. 47]. Consequently, the County's attempt to distinguish Koontz is inapposite.

Even if the monetary exactions in the Agreement bear an essential nexus to a legitimate public purpose, the impacts of the Grand Oaks Project are not roughly proportional to an exaction of $57 million. Particularly given that the Agreement contemplated that those impacts would cost $15 million. If $15 million is roughly proportional to the impacts of the Grand Oaks Project, $57 million, a nearly 400 percent increase, cannot also be roughly proportional to mitigate impacts *for the exact same project*. The District Court acknowledges that there is a two-part test to determine if an unlawful exaction exists, yet fails to evaluate the rough proportionality. Indeed, the District Court's analysis of Count IV ends with a determination that there was an essential nexus to a legitimate public purpose and there were no unconstitutional conditions. Accordingly, the District Court erred as a matter of law and this Court should reverse the finding of summary judgment and remand to evaluate the merits of the claim.

## CONCLUSION

For the reasons and on the grounds and authorities above, Appellants respectfully request that the Court: (1) vacate the District Court's grant of summary judgment in favor of the County on Counts I, II, and IV of the Amended Complaint

and Count I of the Second Amended Counterclaim; (2) enter summary judgment in favor of Appellants on Counts I and II of the Amended Complaint and Count I of the Second Amended Counterclaim; and (3) remand Count IV of the Amended Complaint to the District Court for trial on the merits.

Dated: November 26, 2024.

Respectfully submitted,

**STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.**

 s/ *Erin J. Tilton*
**Glenn Burhans, Jr.**
Fla. Bar No. 605867
**Erin J. Tilton**
Fla. Bar No. 104729
**Liz Desloge Ellis**
Fla. Bar No. 97873
106 E. College Avenue, Suite 700
Tallahassee, Florida 32301
Telephone: 850-580-7200
gburhans@stearnsweaver.com
etilton@stearnsweaver.com
lellis@stearnsweaver.com

*Attorneys for Appellants*

## CERTIFICATE OF COMPLIANCE

The undersigned attorney certifies that this document complies with the type-volume limitation contained in Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains <u>11,270</u> words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and 11th Cir. Local R. 32-4.

The undersigned attorney further certifies that this document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman 14-point font.

                                          s/ *Erin J. Tilton*
                                          Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on November 26, 2024, I uploaded and electronically filed this initial brief of Appellants through the CM/ECF System, which will send a notice of electronic filing to all counsel of record, including counsel for Appellee, listed below. All participants in this case are registered CM/ECF users. I also hereby certify that 4 copies of the initial brief were dispatched for delivery to the Clerk's Office of the United States Court of Appeal for the 11th Circuit by third-party commercial carrier for overnight delivery at the following address: 56 Forsyth Street, N.W., Atlanta, Georgia 30303.

$\phantom{xxxxxxxxxx}$ *s/ Erin J. Tilton* $\phantom{xxxxx}$
$\phantom{xxxxxxxxxx}$ Attorney

**Service List**

Gregory T. Stewart
Matthew R. Shaud
Nabors Giblin & Nickerson, P.A.
1500 Mahan Drive, Suite 200
Tallahassee, Florida 32308
(850) 224-4070
(850) 224-4073 (facsimile)
gstewart@ngnlaw.com
mshaud@ngnlaw.com
legal-admin@ngnlaw.com

*Attorneys for Appellee St. Johns County*